UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN L. SMITH, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 20-cv-30173-KAR |
| | ) |
| SHERIFF LEWIS EVANGELIDIS OF | ) |
| WORCESTER COUNTY JAIL, and | ) |
| CORRECTIONAL OFFICER RICHARD | ) |
| BYRNES (in both official and individual | ) |
| capacities), | ) |
| Defendants. | |

MEMORANDUM AND ORDER ON DEFENDANT WORCESTER COUNTY
SHERIFF LEWIS G. EVANGELIDIS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT
(Dkt. No. 49)

I.   Introduction

Plaintiff Steven L. Smith (Plaintiff) was an inmate at the County of Worcester Jail and House of Correction in 2019. He filed a complaint pursuant to 42 U.S.C. § 1983 (§ 1983) naming as defendants Worcester County Sheriff Lewis G. Evangelidis (Evangelidis) and correctional officer Richard Byrnes (Byrnes) (Dkt. Nos. 1, 1-1). The parties have consented to this court's jurisdiction (Dkt. Nos. 41, 48). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. Before the court is Evangelidis' motion to dismiss so much of Plaintiff's complaint as asserts claims against him. For the reasons set forth below, Evangelides' motion will be ALLOWED in part and DENIED in part.

II.   Factual Allegations

Because the court is ruling on a motion to dismiss, the facts are recited in the light most favorable to Plaintiff, the non-moving party. *See, e.g., Gargano v. Liberty Int'l Underwriters,*

1

*Inc.*, 572 F.3d 45, 48 (1st Cir. 2009) (citing *Fitzgerald v. Harris,* 549 F.3d 46, 52 (1st Cir. 2008)).  The facts are drawn from the complaint and its attachments, which are deemed incorporated into the complaint by reference.  *See, e.g., Urman v. Novelos Therapeutics, Inc.*, 796 F. Supp. 2d 277, 281 (D. Mass. 2011) ("In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken.") (citing *Nollet v. Justices of the Trial Court of Mass.*, 83 F. Supp. 2d 204, 208 (D. Mass.), *aff'd*, 248 F.3d 1127 (1st Cir. 2000)).

Beginning in or around February 2019, Plaintiff was a pre-trial inmate housed at the annex to the Worcester County Jail (Compl. ¶ 14, Dkt. No. 1-1 at 11).  Plaintiff had been transferred to Worcester because he needed protective custody (Compl. ¶ 15).  While Plaintiff was being held in the annex at Worcester, he was harassed by Byrnes, who regularly made offensive comments about Plaintiff's alleged crime, his sexuality, and his atheism (Compl. ¶¶ 16-17).  In addition to comments Byrnes voiced, he encouraged others to join in harassing Plaintiff (Compl. ¶ 16).  For example, Byrnes moved an openly gay inmate to the bunk above Plaintiff, told the inmate to file charges against Plaintiff if Plaintiff messed with him, and gave the inmate favors in exchange for the inmate filing a charge against Plaintiff under the Prison Rape Elimination Act (PREA).  The charge was determined to be false (Compl. ¶¶ 19-21).

On November 15, 2019, Byrnes went into the correctional officers' office, got a banana and a blue latex glove, gave these items to another inmate and directed this inmate to "go 'fuck with [Plaintiff].'  And to stick it in [Plaintiff's] face and ask if he wants to suck it" (Compl. ¶

22).[1]  The inmate, who was fearful of Byrnes' authority, did as he was directed (Compl. ¶ 23). When the inmate accosted Plaintiff, Byrnes was standing with other inmates laughing at Plaintiff's humiliation and anger (Compl. ¶ 24).  This was not the first time that Byrnes had encouraged other inmates to harass and ridicule Plaintiff (Compl. ¶ 25).  Moreover, Plaintiff was not the only inmate harassed by Byrnes.  Although Byrnes had many complaints or grievances made about his conduct, neither his supervisors nor Evangelidis took any action to stop him (Compl. ¶¶ 18, 42).

Plaintiff was afraid to file a grievance concerning the harassing incident because he was afraid that filing a grievance would result in him being transferred back to the Barnstable jail (the county where the criminal charges against him are or were pending) (Compl. ¶ 26).  Plaintiff did not want to return to the Barnstable jail where he had "suffered greatly" (Compl. ¶¶ 13, 26). Byrnes knew that Plaintiff did not want to be transferred back to Barnstable and used to threaten Plaintiff that if Plaintiff filed a grievance, "they'll ship your ass back to Barnstable!" (Compl. ¶ 26).  Before Plaintiff could file a grievance about the November 15, 2019 incident, Byrnes approached him, apologized, and asked Plaintiff not to file a grievance (Compl. ¶ 27).  The next day, Byrnes approached Plaintiff again and inquired why he was so upset over the incident, asking Plaintiff to confirm that Plaintiff was "gay" and making additional sexually inappropriate comments (Compl. ¶ 28).

---

[1] There are discrepancies in Plaintiff's complaint and the attachments thereto about the date of the incident involving the banana in the glove.  The complaint states that the incident occurred on November 19, 2020 (Compl. ¶ 22).  The cover sheet to Plaintiff's grievance states that the date of the incident about which he was filing the complaint happened on November 15, 2019 (Dkt. No. 1-1 at 12).  Plaintiff signed the form and identified the date of his signature as 10-15-19 (Dkt. No. 1-1 at 12).  Lennon's report of his investigation identified the date of the incident involving the banana in the glove as November 15, 2019 (e.g., Dkt. No. 1-1 at 7).  The documents before the court suggest that the incident most likely occurred on November 15, 2019.  Accordingly, this is the date used by the court.

Following this exchange, Plaintiff decided to file a grievance. After Plaintiff obtained a grievance form, the inmate who had accosted him with the banana and latex glove threatened to injure Plaintiff if he filed a grievance (Compl. ¶ 32). Plaintiff agreed that he would not file, but he told the inmate that if Byrnes continued to harass and retaliate against him, Plaintiff would file the grievance (Compl. ¶ 33). Later that evening, Byrnes told everyone he would turn off the television if Plaintiff was watching and Plaintiff discovered that his cell had been searched (Compl. ¶ 34). The next day, Byrnes filed a "bogus" disciplinary report identifying alleged infractions by Plaintiff, after which Plaintiff was taken to the segregation unit (Compl. ¶¶ 37-40).

Once Plaintiff was in the segregation unit, he filed his grievance (Compl. ¶ 40; Dkt. No. 1-1 at 11-16). The grievance included the statement that Plaintiff was "comfortable *where* [he was]! And [he] shouldn't have to be moved because a corrupt C.C. [Byrnes] crosses the line" (Dkt. No. 1-1 at 15). Sergeant Christopher Lennon (Lennon) investigated Plaintiff's "Alleged PREA Incidents/Officer R. Byrnes" by interviewing Byrnes, other correctional officers, and inmates, including Plaintiff, and viewing video surveillance of interactions in the annex (Dkt. No. 1-1). Following Lennon's investigation, he found that Plaintiff's PREA complaint was substantiated, and that Byrnes had failed in the performance of his duty by: violating the PREA policy prohibiting staff/inmate sexual harassment; violating standards of conduct that required truthfulness, maintenance of order, security, and discipline in the jail; engaging in activities contrary to the interests of the jail; engaging in conduct that was immoral, indecent, lewd, or disorderly; and engaging in protected class harassment (Dkt. No. 1-1 at 9).

Lennon informed Plaintiff that he had investigated and substantiated Plaintiff's allegations, that the disciplinary report against Plaintiff would be dismissed, and that Plaintiff would be returned to his dorm. Plaintiff reminded Lennon that he did not want to be transferred

4

back to the Barnstable jail (Compl. ¶ 47). Plaintiff returned to the annex. Within a few hours after Lennon issued his report substantiating Plaintiff's grievance, Plaintiff was transferred back to Barnstable (Compl. ¶¶ 48-49).

    III.    <u>Analysis</u>

        A.  <u>Standard of review</u>

"A Rule 12(b)(6) motion to dismiss challenges a party's complaint for failing to state a claim." *Ngomba v. Olee*, CIVIL ACTION NO. 18-11352-MPK, 2020 WL 107969, at *2 (D. Mass. Jan. 9, 2020). In ruling on the motion, a court must "treat all well-pleaded facts in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 919 F.3d 121, 127 (1st Cir. 2019) (citing *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)). "In order to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Ngomba,* 2020 WL 107969, at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

"Although evaluating the plausibility of a legal claim 'requires the reviewing court to draw on its judicial experience and common sense,' *Iqbal,* 556 U.S. at 679, the court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Twombly,* 550 U.S. at 556). However, "labels and [legal] conclusions, and a formulaic recitation of the elements of a cause of action …." are insufficient to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. "Simply put, the court should assume that well-pleaded facts are

genuine and then determine whether such facts state a plausible claim for relief." *Ngomba,* 2020 WL 107969, at *2 (citing *Iqbal,* 556 U.S. at 679).

A complaint filed by a self-represented litigant like Plaintiff "is held to a less stringent standard than one drafted by a lawyer and is to be read with an extra degree of solicitude." *Pona v. Weeden*, C.A. No. 16-612 WES, 2018 WL 1417725, at *3 (D.R.I. Mar. 21, 2018) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Rodi v. Ventetuolo*, 941 F.2d 22, 23 (1st Cir. 1991)). A self-represented litigant must, nonetheless, show that he is entitled to relief under the rules that govern all litigation in federal court. *See id.* (citing *Twombley*, 550 U.S. at 557).

    B. <u>Plaintiff's claims</u>

Plaintiff identifies § 1983 as the basis for his claims (Compl. ¶ 1). A cause of action under § 1983 is comprised of two essential elements. First, a plaintiff must show "that the conduct complained of transpired under color of state law…." *Santiago v. P.R.*, 655 F.3d 61, 68 (1st Cir. 2011) (citing *Redondo-Borges v. U.S. Dept. of Hous. & Urban Dev.*, 421 F.3d 1, 7 (1st Cir. 2005)), an element that is not in dispute here. *See West v. Atkins*, 487 U.S. 42, 49-50 (1988) ("It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State.") (citing *Monroe v. Pape*, 365 U.S. 167, 172 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). Second, because "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred,'" *Albright v. Oliver*, 510 U.S. 266, 270 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)), a plaintiff must show "that a deprivation of federally secured rights ensued," *Santiago*, 655 F.3d at 68 (citing *Redondo-Borges*, 421 F.3d at 7). Plaintiff has not identified the federally protected rights of which he claims to have been deprived, thereby leaving that task to the court. For his part, Defendant

contends that Plaintiff cannot assert claims against Evangelidis in his official capacity and has not adequately pled a basis for supervisory liability as to any federally protected rights for purposes of § 1983 (Dkt. Nos. 50, 75).[2]

1. Plaintiff's official capacity claims against Evangelidis are barred by sovereign immunity.

Evangelidis is correct that Plaintiff cannot assert claims against him in his official capacity. Plaintiff seeks to recover money damages (Compl. ¶¶ 54-55). "'"[A] suit by private parties seeking to impose liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment"' to the United States Constitution." *Fulton v. Worcester Superior Court Dept.*, CIVIL ACTION NO. 18-cv-40048-DHH, 2018 WL 3637974, at *2 (July 31, 2018) (quoting *Davidson v. Howe*, 749 F.3d 21, 27 (1st Cir. 2014)). "'This is true whether the named defendant is the state itself or … a state official in her official capacity.'" *Id.* (quoting *Davidson*, 749 F.3d at 27). "The courts that have addressed the issue in this jurisdiction have concluded that the Sheriff's Departments of abolished counties are 'arms of the state entitled to sovereign immunity.'" *Brown v. Mass.*, Civil Action No. 11-11019-JGD, 2012 WL 588800, at *4 (D. Mass. Feb. 21, 2012) (quoting *Gallo v. Essex Cty. Sheriff's Dept.*, Civil Action No. 10-10260-DPW, 2011 WL 1155385, at *3 (D. Mass. Mar. 24, 2011)). The Worcester County Sheriff's Office "is an arm of the state and its employees are state employees." *Fulton*, 2018 WL 3637974, at *2 (citing Mass. Gen. Laws ch. 34B, § 1; *Broner v. Flynn*, 311 F. Supp. 2d 227, 233

---

[2] To the extent Evangelidis argues that Plaintiff's complaint did not assert retaliatory transfer as a basis for liability under § 1983, the court rejects that contention. While Plaintiff did not set out his claims in separate counts, his complaint recites repeated threats by Byrnes that Plaintiff would be transferred if he filed a grievance and Plaintiff's repeatedly expressed concerns about a transfer back to the Barnstable jail. As the court ruled in docket entry 97, fairly read, Plaintiff's initial pleading asserted a claim that he was transferred to Barnstable in retaliation for his filing of the grievance against Byrnes that Lennon substantiated by his investigation.

(D. Mass. 2004)).  Thus, Plaintiff's claims against Evangelidis in his official capacity, which seek money damages as a remedy for a constitutional violation, are barred by sovereign immunity.  This immunity does not, however, extend to claims against Evangelidis in his individual capacity.  *Id.*

> 2. Plaintiff's complaint does not adequately set forth a claim of supervisory liability against Evangelidis based on Byrnes' harassment.

Because Evangelidis does not argue otherwise, the court assumes for purposes of this analysis that, by alleging sexual harassment by Byrnes that was found to constitute a PREA violation, along with other forms of verbal harassment, Plaintiff has alleged a predicate for possible liability under § 1983 by a subordinate.  *But see, e.g., Winston v. Auger,* Civil Action No. 15-204S, 2015 WL 6696575, at *2 (D.R.I. Nov. 3, 2015) (stating that allegations of verbal abuse and threats made by department of corrections employees, without more, are not sufficient to state a constitutional violation under § 1983) (citing additional cases); *Collins v. Graham*, 377 F. Supp. 2d 241, 243-44 (D. Me. 2005) (with few exceptions, verbal and sexual harassment does not give rise to section 1983 liability in the prison context) (citing additional cases).

Turning to the question of the general standard for imposing liability on supervisors for alleged constitutional violations committed by individuals they supervise,

> [t]he Supreme Court has held that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, [556 U.S. at 676].  "[A] supervisor may not be held liable for the constitutional violations committed by his or her subordinates, unless there is an 'affirmative link between the behavior of a subordinate and the action or inaction of his supervisor … such that the supervisor's conduct led inexorably to the constitutional violation.'" *Soto-Torres* [*v. Fraticelli*,], 654 F.3d [153] …158 [1st Cir. 2011)] (omission in original) (quoting *Maldonado* [*v. Fontanes*, 568 F.3d [263] … 275 [(1st Cir. 2009))].  Additionally, "the plaintiff must show that the official had actual or constructive knowledge of the constitutional violation." *Rodríguez-García v. Miranda-Marín*, 610 F.3d 756, 768 (1st Cir. 2010), *cert. denied*, --- U.S. ---, 131 S.Ct. 1016 … (2011) (quoting

8

*Rodriguez-Garcia v. Municipality of Caguas*, 495 F.3d 1, 10 (1st Cir. 2007) (internal quotation marks omitted).

*Feliciano-Hernańdez v. Pereira-Castillo*, 663 F.3d 527, 533-34 (1st Cir. 2011) (first and second alterations in original).

Plaintiff does not allege that Evangelidis directly participated in, witnessed, or had knowledge of the specific incidents of harassment by Byrnes. Lennon's report of his investigation did not include any summary of an interview of Evangelidis, nor did Lennon's report make any reference to involvement by Evangelidis or to prior complaints about Byrnes. The only allegations in the complaint bearing on Evangelidis' potential liability for Byrnes' conduct are the following:

- "C.O. Byrnes had many complaints made against him but neither his supervisors nor the sheriff took any actions to intervene and stop him;" and

- "[Evangelidis] had many, many complaints against C.O. Byrnes. I asked public records official Diane M. Cook for a copy of Byrnes work file. I was denied these records. I will ask the judge to order [Evangelidis to] produce all grievances filed against Byrnes! [Evangelidis] did nothing to stop Byrnes from playing judge and jury"

(Compl. ¶¶ 18, 42).

"Although a supervisor need not personally engage in the subordinate's misconduct in order to be held liable, his own acts or omissions must work a constitutional violation." *Parker v. Landry*, 935 F.3d 9, 15 (1st Cir. 2019) (citing *Iqbal*, 556 U.S. at 676). Mere negligence is not enough. "At a minimum, the plaintiff must allege facts showing that the supervisor's conduct sank to the level of deliberate indifference." *Id.* (citing *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016)). To assert a viable claim of deliberate indifference, a plaintiff must plausibly allege "'(1) that the officials had knowledge of facts, from which (2) the official[s] can draw the inference (3) that a substantial risk of serious harm exists.'" *Id.* (quoting *Guadalupe-Báez*, 819 F.3d at 515) (alterations in original). Where, as in this case, the complaint does not

identify any affirmative act by the named defendant that might arguably constitute deliberate indifference, "a plaintiff sometimes can identify a causal nexus by juxtaposing the supervisor's omissions alongside a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations.'" *Id.* (quoting *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994)).  A plaintiff's allegations about a history of regular or widespread abuse must be sufficient to support an inference of knowledge and deliberate indifference on a supervisor's part.

Here, as in *Iqbal*, Plaintiff's allegations about knowledge on the part of Evangelidis are impermissibly conclusory.  In *Iqbal*, the complaint alleged that the respondents (defendants below) "'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement" on account of his race, religion, or national origin.  *Iqbal*, 556 U.S. at 680 (alteration in original).  The Court held that these "bare assertions" amounted to nothing more than pleading the elements of the claim and were "not entitled to be assumed true." *Id.* at 681 (citing *Twombly*, 550 U.S. at 554-55).  Here too Plaintiff has done nothing more than allege generally (and speculatively) that there were many internal grievances filed against Byrnes, and that Evangelidis knew or should have known about a history of complaints that Plaintiff assumes existed.

Plaintiff, who was familiar with the grievance process at the Worcester house of correction, has not described a grievance process that involved Evangelidis in any way, nor, in the documents appended to Plaintiff's complaint, is there any indication that Evangelidis was notified about or involved in the adjudication of Plaintiff's grievance against Byrnes.  While Plaintiff has alleged that Byrnes mistreated inmates in addition to himself, he has not identified any other inmate who filed a grievance against Byrnes.  While Plaintiff has alleged that Byrnes'

10

fellow officers were aware of Byrnes' corruption, he has not identified any such correctional officer, nor has he alleged that any specific officer complained to prison authorities about Byrnes. Where Plaintiff has, in effect, done nothing more than allege generally that Byrnes had many grievances filed against him, without identifying the specifics of any grievances apart from his own, and that Evangelidis, as the sheriff, knew or should have known about Byrnes' misconduct, Plaintiff has not adequately alleged a claim of supervisory liability premised on Byrnes' misconduct. *See Hewes v. Belknap Cty.*, Case No. 17-cv-394-SM, 2018 WL 922356, at *3 (D.N.H. Feb. 15, 2018) (ruling that the complaint did not state an adequate basis for supervisory liability where the plaintiff alleged that a correctional officer engaged in sexual misconduct on multiple occasions but did not assert facts to support the allegations that the correctional officer's supervisors knew or should have known about the correctional officer's misconduct; the complaint did not allege deliberate indifference to the plaintiff's rights); *see also Parker*, 935 F.3d at 15-16) (holding that plaintiff's allegations that the correctional officer who sexually abused her had a reputation for avoiding the consequences of his bad behavior and was a close friend of an another officer who was suspended for misconduct were insufficient to put supervisory officials "on notice of a substantial risk of serious harm").

3. Plaintiff's complaint states a claim against Evangelidis for retaliatory transfer in violation of the First Amendment.

Plaintiff's retaliatory transfer claim finds much more support in his complaint. This is because:

> [t]he First Amendment guarantees not only freedom from governmental censorship, but also freedom from official retaliation on the basis of protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 … (2006)) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out"). "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Id.* (quoting *Crawford-El v. Britton*, 523

11

> U.S. 574, 588 n.10 … (1998)) (alteration in original). Thus, even conduct that "fall[s] short of a direct prohibition against the exercise of First Amendment rights" can be actionable if it has a "deterrent, or 'chilling' effect." *Board. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 … (1996) (quoting *Laird v. Tatum*, 408 U.S. 1, 11 … (1972)).

*Mattei v. Dunbar*, 217 F. Supp. 3d 367, 373-74 (D. Mass. 2016) (second, third and fourth alterations in original).

"It is well-established that retaliating against an inmate for filing grievances violates that inmate's First Amendment rights." *Id.* at 379 (citing *Mack v. Warden Loretto FCI*, 839 F.3d 286, 300 (3d Cir. 2016)). "Because prisoner retaliation claims are 'easily fabricated[] and … pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration,' courts must insist that such claims are bound up in facts, not in the gossamer strands of speculation and surmise." *Hannon v. Beard*, 645 F.3d 45, 48 (1st Cir. 2011) (alterations in original) (quoting *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks omitted)).

In the instant case, Plaintiff's claims are not conjured up out of speculation or surmise. To make out a retaliation claim, a prisoner must plausibly allege that "he engaged in a protected activity, that the state took an adverse action against him, and that there is a causal connection between the former and the latter." *Id.* (citing *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)); *see also Partelow v. Mass.*, 442 F. Supp. 2d 41, 51 (D. Mass. 2006). As to the first element of protected activity, "[p]risoners 'undoubtedly ha[ve] a First Amendment right to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right.'" *Brown v. Corsini*, 657 F. Supp. 2d 296, 305 (D. Mass. 2009) (second alteration in

original) (quoting *Shabazz v. Cole*, 69 F. Supp. 2d 177, 197 (D. Mass. 1999)). Plaintiff engaged in protected activity when he filed his grievance against Byrnes.

Second, "[a]lthough prison officials ordinarily have 'extremely broad' discretion to transfer prisoners, they may not transfer an inmate in retaliation for his exercise of a constitutional right." *Partelow*, 442 F. Supp. 2d at 51 (citing *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979); *Shaheed-Mohammed v. Dipaolo*, 138 F. Supp. 2d 99, 105 n.18 (D. Mass. 2001)); *see also Brown*, 657 F. Supp. 2d at 304 (same). At this stage, the court accepts as true (and, indeed, there seems little reason to doubt) Plaintiff's representations that he repeatedly made known his objections to returning to Barnstable because of the conditions he had endured in that facility, including to Byrnes and Lennon, the internal affairs investigator who investigated and substantiated Plaintiff's grievance against Byrnes. Plaintiff further alleges that it was well-known that inmates who became a problem in Worcester would be returned to their charging county, that his conditions of confinement would be harsher in Barnstable, and that Byrnes, relying on the policy or practice of transferring problem inmates, repeatedly threatened Plaintiff with transfer if he filed a grievance about Byrnes' harassment (Compl. ¶ 26). Plaintiff has sufficiently alleged that his transfer from the annex in Worcester back to the jail in Barnstable was an adverse action (Compl. ¶¶ 11, 13, 26, 47-48). *See Brown*, 657 F. Supp. 2d at 305 (holding that, if all facts and inferences were drawn in plaintiffs' favor, their transfer to a different facility constituted an adverse action).

Third, a complaint must allege a causal connection between the protected activity and the adverse action. "[D]irect proof of a retaliatory motive is not essential to make out a prima facie case." *Hannon*, 645 F.3d at 49 (citing *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987) (per curiam)). "In some instances,

13

circumstantial evidence, (say, temporal proximity between a protected act and an adverse action …) may suffice." *Id.* (citing *Westefer v. Snyder*, 422 F.3d 570, 584 (7th Cir. 2005); *Bennett*, 343 F.3d at 138); *Mattei*, 217 F. Supp. 3d at 377 ("temporal proximity between the protected activity and the allegedly retaliatory act can itself be sufficient circumstantial evidence of causation") (citing *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016)); *Partelow*, 442 F. Supp. 2d at 52 (an allegation of temporal proximity between the protected activity and the retaliatory act is "'sufficient to withstand a motion to dismiss'") (quoting *Layne v. Vinzant*, 657 F.2d 468, 476 (1st Cir. 1981)). According to Plaintiff, Lennon met with him, told him that he had substantiated Plaintiff's claims against Byrnes, and that Lennon was going to have Byrnes' disciplinary report dismissed. Lennon apparently assured Plaintiff that Plaintiff would return to and remain in the dorm at Worcester (Compl. ¶ 47). Less than twenty-four hours after Plaintiff filed his grievance (Compl. ¶ 11), and "[s]oon" after Plaintiff returned to the dorm after his conversation with Lennon, he was summoned to the guard office, told to pack his belongings, and "within a couple of hours" he was "transferred back to Barnstable jail" (Compl. ¶ 47). Plaintiff's allegation that he was transferred back to Barnstable immediately after Lennon substantiated Byrnes' misconduct is a legally sufficient allegation of causation.

The court acknowledges that Plaintiff has not alleged that Evangelidis personally directed his transfer to Barnstable. However, "[o]ne way in which a supervisor's behavior may come within this rule [of supervisory liability under § 1983] is by formulating a policy, or engaging in a custom, that leads to the challenged occurrence." *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)); *Perry v. Dickhaut*, 125 F. Supp. 3d 285, 299 (D. Mass. 2015) (same). Plaintiff has alleged that the Worcester house of correction had a well-known policy or practice of transferring inmates

who filed grievances back to their charging county. Indeed, he has alleged that Byrnes knew about this policy and invoked it when he threatened Plaintiff with a transfer if Plaintiff filed a grievance about his misconduct (Compl. ¶ 26). This allegation of a well-known policy or practice is sufficient at the motion to dismiss stage. *See Montrond v. Spencer*, Civil Action No. 17-10505-ADB, 2021 WL 5040318, at *3 (D. Mass. Oct. 29, 2021) (declining to dismiss a complaint against prison supervisors where there were "allegations of an unspoken policy or custom of mistreatment of inmates"). In summary, Plaintiff has adequately pled a claim of retaliatory transfer against Evangelidis.

    4. <u>Conclusion</u>

For the foregoing reasons, Evangelidis' motion to dismiss is ALLOWED (Dkt. No. 49) as to Plaintiff's claim based on Byrnes' harassment of Plaintiff. The dismissal is without prejudice. Plaintiff may seek leave to amend his complaint within forty-two days of the date on which this decision is docketed as to claims based on Byrnes' harassment. Evangelidis' motion is DENIED as to Plaintiff's claims of retaliatory transfer.

It is so ordered.

Dated: March 22, 2022                                            Katherine A. Robertson
                                                                   KATHERINE A. ROBERTSON
                                                                   U.S. MAGISTRATE JUDGE